IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| GEORGE DOUGLAS LIMBERHAND, | CV 20-00099-BLG-BMM-KLD |
| Plaintiff, | |
| vs. | FINDINGS AND RECOMMENDATIONS OF U.S. MAGISTRATE JUDGE |
| CITY OF BILLINGS POLICE DEPARTMENT, OFFICER BECKER, OFFICER BICKFORD, OFFICER MCKNIGHT, and OFFICER PUCKETT, | |
| Defendants. | |

Pending before the Court are motions for summary judgment filed by Defendant City of Billings Police Department ("BPD") (Doc. 28) and Defendants Becker, Bickford, McKnight, and Puckett ("Officer Defendants") (Doc. 31). Based on the following discussion, the Court recommends that both motions be granted.

## I. FACTUAL BACKGROUND[1]

The basic facts underlying this litigation are as follows. On December 16, 2019, Plaintiff George Douglas Limberhand had an interaction with a United

---

[1] Throughout this order, the facts are drawn from both Defendants' Statements of Undisputed Facts ("SUF") and from Limberhand's Statement of Disputed Facts ("SDF"), as well as supporting documents. (Docs. 30, 33, and 53.) Limberhand submitted only one brief and SDF in response to both motions.

States Postal Service mail truck driver, who subsequently called the police. (Doc. 30 at 2 – 3.) During this interaction, Limberhand had a knife in his hand and mentioned "jacking" the mail truck. (Doc. 30 at 2 – 3.)[2] The driver of the mail truck was able to drive away before anything further happened. *Id.*

Several officers, including the defendants, responded to the 911 call and located Limberhand at the side of a street in downtown Billings. Limberhand had a knife in his hand. There was a woman with him, identified by Limberhand as a friend, Georgina Rose. (Doc. 30-13 at 7.) For some time, Limberhand refused to obey commands to drop the knife and shouted various things at the responding officers. (Doc. 33 at 3.) After several verbal attempts to get Limberhand to put down the knife, the conflict escalated, with the police eventually bumping him with a patrol car, tasering him, spraying him with pepper spray, stomping on his hand, and handcuffing him. Limberhand specifically alleges that Defendant Becker tased and pepper-sprayed him, that Defendants McKnight and Puckett tased him, and that Defendants Bickford, Puckett and McKnight assaulted him. (Doc. 2 at 5.) The parties' characterizations of these specific actions differ, but there appears to be general agreement about the sequence of events. Limberhand was then checked by an EMT and taken to jail.

---

[2] Limberhand agrees that the facts of his interaction with the mail truck are undisputed. (Doc. 52-1 at 1.)

Limberhand's Complaint alleged "racial profiling, excessive use of force, and cruel and unusual punishment along with equal protection of law." (Doc. 2 at 3.) In his response brief on summary judgment, Limberhand concedes that his racial profiling and equal protection claims "should be dismissed." (Doc. 52 at 1.)

## II. ANALYSIS

### A. Standard for Summary Judgment

Federal Rule of Civil Procedure 56(a) entitles a party to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The movant bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A material fact is one that might affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Once the moving party has satisfied its burden, the non-moving party must go beyond the pleadings and designate by affidavits, depositions, answers to interrogatories, or admissions on file, "specific facts showing that there is a genuine issue for trial." *Id.* at 324. In deciding a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party and

draws all justifiable inferences in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Betz v. Trainer Wortham & Co., Inc.*, 504 F.3d 1017, 1020-21 (9th Cir. 2007).

### B. Officer Defendants' Motion

Officer Defendants move for summary judgment on two grounds. First, they assert that, as they were sued only in their official capacity in Limberhand's Complaint, they are not liable as persons themselves, but only as embodiments of the municipality. (Doc. 32 at 4.) Second, they assert that Limberhand's claims fail factually, warranting summary judgment in their favor, and that Defendants enjoy qualified immunity.

### 1. Capacity issue

Officer Defendants assert that because Limberhand ticked only the "official capacity" boxes on the form Complaint, they cannot be liable as individuals. The Court finds this assertion to elevate form over substance. It is clear from the facts alleged in the Complaint that Limberhand is asserting that the actual conduct of these officers, not only any municipal policy or practice directing the conduct, violated his rights. Further, Limberhand clearly sought money damages against the officers, which are not available on an official capacity claim. (Doc. 2 at 5.) "Where state officials are named in a complaint which seeks damages under 42 U.S.C. § 1983, it is presumed that the officials are being sued in their individual

4

capacities." *Shoshone-Bannock Tribes v. Fish & Game Comm'n, Idaho*, 42 F.3d 1278, 1284 (9th Cir. 1994) (citing *Price v. Akaka,* 928 F.2d 824, 828 (9th Cir.1990), *cert. denied,* 502 U.S. 967 (1991).) The Court finds that Officer Defendants were on notice that they were being sued in their individual capacities, and in accordance with the Court's obligation to construe pro se pleadings liberally, it will not recommend summary judgment for Officer Defendants on that ground.

### 2. Racial Profiling and Equal Protection

Limberhand concedes his claims for racial profiling and equal protection. (Doc. 52 at 1.) Therefore, judgment should be entered for Officer Defendants on those claims.

### 3. Qualified Immunity and Excessive Force

The Officer Defendants contend that they did not use excessive force and, in any event, are entitled to qualified immunity. The doctrine of qualified immunity protects government officials from civil liability where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (*quoting Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "'Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments,' and 'protects all but the plainly incompetent or those who knowingly

violate the law.'" *Stanton v. Sims*, 572 U.S. 3, 6 (2013) (citations omitted).

To determine if an official is entitled to qualified immunity a court considers two factors: (1) whether the facts as alleged state a violation of a constitutional right, and (2) whether the right is clearly established, such that a reasonable official would have known that his or her conduct was unlawful. *Saucier v. Katz*, 533 U.S. 194, 200 (2001) (*receded from* by *Pearson v. Callahan*.) A district court is "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236.

Limberhand has a constitutional right not to suffer excessive force during an arrest. Whether excessive force was used during the course of an arrest is evaluated under the Fourth Amendment; force is unconstitutionally excessive if it is "objectively unreasonable." *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015). Objective reasonableness turns on the "facts and circumstances of each particular case." *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). "A court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Id.* (citing *Graham*, 490 U.S. at 396).

The following considerations bear on the reasonableness of the force used:

"the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting. The most important factor is whether the suspect posed an immediate threat. This analysis is not static, and the reasonableness of force may change as the circumstances evolve.

*Hyde v. City of Willcox*, No. 21-15142, 2022 WL 55542, at *4 (9th Cir. Jan. 6, 2022) (internal citations and quotations omitted). "[W]e examine the totality of the circumstances and consider whatever specific factors may be appropriate in a particular case…" *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010) (internal quotations and citations omitted). "Although [an] attempt to craft an easy-to-apply legal test in the Fourth Amendment context is admirable, in the end we must still slosh our way through the factbound morass of "reasonableness." " *Scott v. Harris*, 550 U.S. 372, 383 (2007).

To determine whether the Officer Defendants' actions were objectively reasonable, the Court must first ascertain the relevant facts. As pointed out above, the parties disagree about several facts, specifically regarding the degree of threat posed by the defendant, and the extent of the force used against him. Indeed, even the various officer statements differ as to details and sequences. "When things are in such a posture, courts are required to view the facts and draw reasonable

inferences in the light most favorable to the party opposing the motion." *Scott v. Harris*, 550 U.S. 372, 378 (2007) (internal quotations and citations omitted).

However, facts must only be viewed in the light most favorable to the non-movant if there is a "genuine" dispute. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial. " *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–587 (1986) (footnote omitted). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–248 (1986). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

The *Hyde* factors identified above provide the frame for the Court's determination of the relevant facts. *Hyde*, 2022 WL 55542, at *4 (9th Cir. Jan. 6, 2022). The first part of the Court's analysis must focus on Limberhand's behavior, which is the point of greatest difference between the parties' recollections, and which undergirds three of the relevant *Hyde* factors: the severity of the security

problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting. *Id*.

Limberhand's repeated characterization of his own actions is as fairly docile. He says he was "cooperating with putting the knife down," (Doc. 53 at 1), and that after more than ten minutes of dialogue, "it did appear, and consistent with my body language, that progress was being made." *Id*. Limberhand denies he raised his knife in a threatening manner. (Doc. 53 at 3.) Limberhand also has submitted the statement of Georgina Rose, which generally supports Limberhand's position.[3]

Defendants describe his actions differently. Defendant Nelson describes Limberhand as raising the knife towards him and screaming. (Doc. 33 at 3.) Nelson thought that Limberhand's behavior was erratic and that he might use the knife against police or any of the civilians in the area. *Id*. Becker thought Limberhand was moving the knife around erratically. (Doc. 33 at 4.) Limberhand appeared agitated, was gripping the knife tightly, and was pacing back and forth. (Doc. 33 at

---

[3] Defendants correctly point out that Rose's statement is not technically admissible as an affidavit or an unsworn declaration. (Doc. 54 at 4.) However, the Court is able to weigh this document within the context described in this order regarding factual disputes. Presumably Rose would testify at trial to her impressions as stated in the affidavit, which informs the Court's ability to determine whether the document puts material facts in dispute. Cited material does not have to be in an admissible form, but it must be capable of being presented in an admissible form at trial. Fed. R. Civ. P. 56(c)(2); *Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir. 2003).

5.) Officers were concerned about the safety of themselves and Rose, as well as other bystanders.

A difficulty in assessing the facts in this case arises because Limberhand did not comply with the requirements of L.R. 56.1(b). L.R. 56.1(b) requires a Statement of Disputed Facts that directly responds to each of Defendants' facts and cites specific support in the record. Limberhand does not identify any source for his factual assertions other than his own recollections, with vague references to his declaration and the statement of Georgina Rose. He also refers to the video he submitted to the Court but without specific citations that direct the Court and parties to any part that supports his position. As Defendants point out in their reply brief, "a district court has no independent duty to scour the record in search of a genuine issue of triable fact…" *Simmons v. Navajo Cty., Ariz.*, 609 F.3d 1011, 1017 (9th Cir. 2010). (Doc. 54 at 4 – 6.)

The Court does have a partial video of the events, provided and relied upon by Limberhand. (Doc. 48.)[4] The Court may use the video to assist in its determination of what a reasonable jury could conclude. *Scott v. Harris*, 550 U.S.

---

[4] One oddity about this case is that Limberhand's friend Georgina Rose claims she took cell phone video of these events, (Doc. 53 at 5), and Limberhand suggested that she had taken the video, but the video he had submitted to the Court is from a television news report. As far as the Court is aware, Rose's phone video has never been filed.

372, 380–81 (2007). The video is from a television news report and is only 40 seconds, so it is an incomplete portrayal of the events. (Other evidence in the record suggests this entire episode lasted at least twenty or thirty minutes.) The Court does not know who took the video, though Defendant Becker stated in his report that media were on the scene. (Doc. 30-5 at 2.) The Court also does not know whether Defendants have viewed and considered the video. In their reply brief, they state that "there is no video evidence in the record." (Doc. 54 at 5.) However, Defendants were aware that Limberhand was directed to file his video with the Court. (Doc. 47.) Further, Limberhand provided stills from the video in a prior motion with the Court. (Doc. 38-1 at 1 – 8.) The Court does not find credible any assertion that Defendants were not aware of the existence of this video. Because it is a news report, presumably available to Defendants upon request to the news station as well as from the Court, and because the non-movant here relies on it for his factual support, the Court will take judicial notice of its contents. Neither party alleges that the video is doctored or altered, other than its obvious incompleteness, allowing the Court to rely on it to resolve some of the disputes between the parties. *Scott v. Harris*, 550 U.S. 372, 378 (2007).[5]

---

[5] The thumb drive containing the video is available for viewing at the Clerk of Court's Office at the James F. Battin Courthouse, Billings, Montana.

Limberhand relies on this video in his brief and encourages the Court to use it to determine what happened, yet his description of some of the events does not match up with what is seen on the video. Nor, to be fair, do some of Defendants' assertions. However, the video does clarify a few material facts.

First, Limberhand's suggestion that he quietly sat on the snow and was about to hand over his knife is belied by a section of the tape where he is moving in an erratic manner in front of the police. Limberhand claims he was "sitting down speaking with [an officer] and was responding by self-deescalating." (Doc. 52 at 7.) The tape does show him sitting on a curb, holding a knife in his hand. (Doc. 48 at 00:13.) Officer Defendants concur that he sat down at one point and looked like he was going to put the knife down.[6] (Doc. 33 at ¶ 14.) However, shortly later, he is moving quickly and unpredictably on the sidewalk. (Doc. 48 at 00:21.) The view of Limberhand is obscured by two officers standing on the sidewalk, so it is not possible to see exactly what Limberhand is doing. However, it is clear that his movements are erratic; he is not, as he asserts, behaving in a predictable, non-threatening manner.

The statement provided by Rose contributes to a picture of confusion and threat. Rose states that Limberhand was about to put the knife down when he was

---

[6] The knife, as shown in the video and in the photo attached to Defendants' brief, is not quite a "small knife" as described by Limberhand. (Doc. 52-1 at 2; Photo at Doc. 33-3 at 6.)

tased for the first time, but then she goes on to detail that the officers continued to "yell at George to put the knife down." (Doc. 53 at 6.) She also states that she was advised to move away from him more than once, corroborating the officers' statements that there was reason to worry about her safety. (Doc. 53 at 5 – 6.) She also claims there were other people in the area yelling something that she could not hear at the officers. All told, Rose's statement bolsters the impression of the officers that there were potentially vulnerable civilians about, and that Limberhand was refusing to put down the knife.

Based on the record, in assessing the *Hyde* factors of the severity of the security problem at issue, the threat reasonably perceived by the officers, and whether the plaintiff was actively resisting, the Court concludes that the Defendants officers were justified in using the force they did. *Id*. *Hyde* identifies whether the suspect posed an immediate threat as the most important factor, and the Court concludes that the officers reasonably thought he did.

The Court turns, then, to another of the *Hyde* factors, the amount of force used, to see if, given the reasonable perception of threat, the officers acted appropriately.

a. Tasers

Limberhand relies on *Bryan v. MacPherson*, 630 F.3d 805 (9th Cir. 2010), to argue that because he was a "non-fleeing" suspect, the deployment of the taser

against him was a per se violation of the Fourth Amendment. (Doc. 52 at 3 – 4.)
But Limberhand's reliance on *Bryan* goes too far. *Bryan* concludes that the use of
tasers is an intermediate, significant level of force that can cause a "painful and
frightening blow." *Bryan*, 630 F.3d at 826. "Similarly, the Ninth Circuit has found
the use of a Taser excessive if the suspect does not pose an immediate threat."
*Hyde v. City of Willcox*, No. 21-15142, 2022 WL 55542, at *6 (9th Cir. Jan. 6,
2022). That is, as *Scott* holds, a fact-specific inquiry, requiring the Court to "slosh
our way through the factbound morass of "reasonableness." " *Scott v. Harris*, 550
U.S. 372, 383 (2007). The scenario faced by the police in *Bryan* is factually
distinct, in determinative ways, from Limberhand's.

There were two separate tasering incidents. The first was when Defendant
Becker attempted to tase Limberhand when Limberhand was standing on the
sidewalk near Rose, still engaged with the negotiating officer, Jones. (Doc. 33-1 at
3.) This deployment did not incapacitate Limberhand, presumably because of his
bulky clothing, though Becker thought it caused Limberhand some pain, and
Limberhand stated that it hurt. (Doc. 33-2 at 4; Doc. 53 at 2.) Limberhand did not
release the knife as a result. (Doc. 33-2 at 4.)

The second taser episode occurred after Limberhand had slipped or tripped
and was down on the sidewalk. The fall and the convergence of officers is visible
on the video. (Doc. 48 at 00:28.) The record is not very clear about who deployed

their tasers and whether contact was made. Limberhand alleges Officers Puckett and McKnight tased him when he was on the ground. (Doc. 2 at 5.) Officer Puckett said she did deploy her taser once Limberhand was on the ground, before Limberhand was disarmed. (Doc. 33-4 at 3.) Defendant McKnight's report is poorly written and does not state that she deployed a taser. The report makes it sound like she was in her patrol car during the events. (Doc. 33-3.) However, Becker states that he believes McKnight deployed her taser. (Doc. 33-2 at 4.) For the purposes of summary judgment, the Court will assume that she did.

In *Bryan*, the plaintiff was pulled over for not wearing his seatbelt. He got out of his car, against the policeman's instructions, and was acting erratic. However, he was fifteen to twenty-five feet away from the policeman, he did not have a weapon, he was not near any other civilians, and he was standing on the asphalt, meaning that the taser deployment resulted in him falling on his face and breaking four teeth. *Bryan v. MacPherson*, 630 F.3d 805 (9th Cir. 2010).

The facts of Limberhand's situation meaningfully change the evaluation of the use of force. Limberhand had a knife and was in much closer proximity to the police and other people in downtown Billings. The officers encountered Limberhand after he had apparently threatened a postal employee with his knife. Two separate reports had been made to 911 regarding Limberhand's knife and behavior. (Doc. 30 at 3.) Limberhand refused Defendants' commands to drop his

15

knife and attempted to flee. (Doc. 30 at 3 - 8.) Limberhand repeatedly emphasizes his state of mind and the fact that he was considering putting the knife down. However, the police could base their actions only on his actions, not his thoughts.

Given the circumstances, in light of the *Hyde* factors, the Court concludes that the deployment of tasers was not unreasonable. For over 20 minutes, the officers had commanded Limberhand to put the knife down. He refused to do so and appeared to be willing to leave the area. Limberhand no doubt suffered pain due to the tasers, and his face did show an abrasion in the photos in the record. (Doc. 48.) Limberhand's brief emphasizes the pain of being tased, which is not in dispute. However, the Court concludes that these injuries to Limberhand were a result of a constitutionally-sound deployment of the tasers. Defendants should be granted summary judgment.

### b.  Pepper Spray

Becker attempted to pepper spray Limberhand but the discharge was at too great a distance to have an immobilizing effect. (Doc. 33-2 at 4.) The discharge of the pepper spray is visible in the video, at the same time of the bumps by the car. (Doc. 48 at 00:25.) Limberhand lurches away from the spray, with his back toward Becker, and the officer is blocked by the car from moving toward him. *Id.* For the same reasons the Court finds the deployment of tasers in this situation not to be unreasonable, Becker's attempt to pepper spray him was not unconstitutional.

c.  Physical assault

Limberhand's Complaint alleges that Officers Becker, Bickford, Puckett and McKnight assaulted him. (Doc. 2 at 5.) Limberhand asserts that "after being hit by the car, his knife was tossed when falling." (Doc. 52 at 9.) He then claims he was "gang-beaten", "kicked in the head, face, and torso over and over while he was no longer in possession of the knife." *Id.* Limberhand focuses quite a bit on the fact that he no longer had the knife in his hand when the officers reached him on the sidewalk. The video shows the knife in Limberhand's right hand when he is first bumped by the car, but it is not possible to tell what happens with it from there. (Doc. 48 at 00:24.) Limberhand says he dropped it as he was bumped by the car and fell on the sidewalk. (Doc. 53 at 3.) Defendant Nelson claims to have stomped on the hand holding the knife, on the sidewalk, causing Limberhand to release it. (Doc. 33-4 at 3.) Whether the knife was in his hand for some amount of time while he was on the ground is immaterial; the officers reasonably believed that he was armed, until they were able to handcuff him and get the knife away. "A court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396).

The video does not show the all-out assault alleged by Limberhand. (Doc. 48 at 00:32.) There is an obvious editing cut in the video between the time that

Limberhand gets around the car and the congregation of the officers, so the Court

cannot know exactly what has been cut. (Doc. 48 at 00:31.) In what follows,

Limberhand can be seen rolling around, which is an ambiguous response to the fact

that several officers are converging on him. The video does not show him being

repeatedly kicked or hit. It shows a couple of tepid kicks that are consistent with

someone trying to kick a hand or a knife along the sidewalk. The scuffle on the

sidewalk lasts for about ten seconds and involves several officers. (Doc. 48 at

00:30.) Defendants did not use excessive force in handcuffing Limberhand.

### d.  Medical Claim and Cruel and Unusual Punishment

Limberhand's interaction with the police occurred during his arrest, making

him an arrestee and, to the extent any issues arose after his arrest, a pretrial

detainee. As such, his claims do not arise under the cruel and unusual punishment

clause of the Eighth Amendment, which applies only to convicted prisoners. His

Complaint implies that the physical altercation at his arrest is what he considers

cruel and unusual punishment. However, allegations of excessive force during an

arrest, such as Limberhand's, are examined under the Fourth Amendment's

prohibition on unreasonable seizures, as discussed above. *Graham v. Connor*, 490

U.S. 386, 394 (1989).

Limberhand also alleges that he was "never treated for being tased, or OC

sprayed," suggesting that his cruel and unusual punishment claim could be a claim

for post-arrest medical care. (Doc. 2 at 5.) Suspects have a Fourth Amendment right to "objectively reasonable post-arrest [medical care]." *Tatum v. City & County of San Francisco*, 441 F.3d 1090, 1099 (9th Cir.2006). Officers must "seek the necessary medical attention for a detainee when he or she has been injured while being apprehended by either promptly summoning the necessary medical help or by taking the injured detainee to a hospital." *Id.* (quoting *Maddox v. City of Los Angeles,* 792 F.2d 1408, 1415 (9th Cir.1986)). However, this standard does not require "an officer to provide what hindsight reveals to be the most effective medical care for an arrested suspect." *Id*. at 1098. "[A] police officer who promptly summons the necessary medical assistance has acted reasonably for purposes of the Fourth Amendment." *Id*. at 1099.

Limberhand was seen by medical professionals immediately after he was handcuffed by the police. (Doc. 33 at 6; Doc. 30 at 8.) Limberhand characterizes this review as being "briefly examined by medics …who appeared to be only concerned with wiping the dirt and blood away from my face to help cover up the injuries…" and "removing a taser prong or two." (Doc. 52-1 at 4.) He contends that complaints of injuries to his legs, back, and shoulder were ignored. *Id.*

However, Limberhand has not named any defendant who was responsible for any of this medical care. Nor has he alleged how the treatment he received was constitutionally insufficient, or that he suffered serious harm due to the lack of

medical care. He has not alleged facts that would suggest that the care he received was unreasonable. Defendants should be granted summary judgment on any medical claim.

### C. City of Billings' Motion

Defendant the City of Billings Police Department ("BPD") filed its own motion for summary judgment. (Doc. 28.) BPD's motion contends that Limberhand can establish neither that his constitutional rights were violated, nor that any violation was a result of a City of Billings policy, procedure, or custom, as required for *Monell* liability. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978). As explained above, the Court does not find any constitutional violation by the responding officers, and therefore Limberhand's claims fail under *Monell* as well. In addition, Limberhand has failed to allege sufficient facts regarding a policy, custom or practice of the City of Billings.

Under §1983, a municipality can be held liable for constitutional violations that occur pursuant to its policy, custom, or practice. Liability only attaches where the municipality itself causes the constitutional violation through "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Ulrich v. City & Cnty. of San Francisco*, 308 F.3d 968, 984 (9th Cir. 2002)); *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1096 (9th Cir. 2013); *Monell v. Dep't of Soc. Servs. of*

*City of New York*, 436 U.S. 658, 694 (1978). A municipality cannot be liable under §1983 on the theory of respondeat superior alone. *Monell*, 436 U.S. at 691.

BPD filed a Notice of Noncompliance with Court's Order, asserting that Limberhand had not properly responded to its motion for summary judgment and therefore, the case should be dismissed on that ground. (Doc. 55.) BPD relies on this Court's prior admonishment to Limberhand that failure to file a timely response may result in dismissal. While the Court agrees that Limberhand did not file an independent brief in response to BPD's brief, Limberhand did assert two grounds of possible *Monell* liability in his brief. The Court will not grant BPD's motion without considering the viability of Limberhand's arguments.

Limberhand makes a blanket assertion in his brief that the BPD failed to train its officers properly, resulting in his injuries. (Doc 52 at 7.) Limberhand contends that his "complaint and allegations" support this claim, but he does not provide any factual basis or even citation to his own Complaint that would support this point.

The failure to train employees can form the basis for *Monell* liability when it "amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). Generally, to prove deliberate indifference requires showing a "pattern of similar constitutional violations by untrained employees." *Connick v. Thompson*, 563 U.S.

51, 61 (2011). Limberhand has neither alleged nor established any pattern of violations. Nor has he alleged or proposed facts that would show any of these officers were untrained or improperly trained. Defendant BPD should be granted summary judgment on this argument.

Limberhand also refers to what he considers a custom or practice of an unlawful use of force, asserting "many past assaults from the Billings Police Department," though he does not specify if this is his personal experience or a general impression. (Doc. 52 at 7.) He does not point to any evidence in the record. To establish *Monell* liability on a policy and custom theory, Limberhand must show "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *Castro v. Cty. of L.A.*, 833 F.3d 1030, 1075 (9th Cir. 2016) (en banc). Limberhand, in fact, asserts the opposite, that the officers "were not following protocol" when they acted as they did. (Doc. 52 at 7.) A custom, as opposed to a formal policy, must "be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911,918 (9th Cir. 1996). Though Limberhand mentions "many past assaults," he does not support this pattern, much less establish it, with any facts. Defendants should be granted summary judgment.

## III.  CONCLUSION

Based on the foregoing, the Court enters the following:

## RECOMMENDATIONS

1.  The Court should GRANT Defendants' motions for summary judgment. (Docs. 28 and 31.)

2.  The Clerk of Court should be directed to close this matter and enter judgment pursuant to Rule 58 of the Federal Rules of Civil Procedure.

3.  The Clerk of Court should be directed to have the docket reflect that the Court certifies pursuant to Rule 24(a)(3)(A) of the Federal Rules of Appellate Procedure that any appeal of this decision would not be taken in good faith.

4.  At all times during the pendency of this action, Limberhand must immediately advise the Court of any change of address and its effective date. Failure to file a notice of change of address may result in the dismissal of the action for failure to prosecute pursuant to Fed. R. Civ. P. 41(b).

## NOTICE OF RIGHT TO OBJECT
## TO FINDINGS & RECOMMENDATION
## AND CONSEQUENCES OF FAILURE TO OBJECT

The parties may object to the Findings and Recommendations within 14 days.  *See* 28 U.S.C. § 636(b)(1). Failure to timely file written objections may bar a de novo determination by the district judge and/or waive the right to appeal.

DATED this 23rd day of February, 2022.

Kathleen L. DeSoto
United States Magistrate Judge